UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MCKINLEY KELLY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  No. 1:21-cv-01404-JMS-TAB |
| DR. MICHAEL MITCHEFF, et al., | ) ) ) |
| Defendants. | ) |

**Order Granting Defendants' Motions for Summary Judgment**

McKinley Kelly is in Indiana Department of Correction (IDOC) custody and suffers from gynecomastia, a benign proliferation of glandular tissue in the male breast. He brought this action alleging that the defendants, two corporate medical providers and three individual doctors, were deliberately indifferent to his condition. The Court dismissed several claims and defendants at screening, and it later granted Mr. Kelly's motion to dismiss claims against another defendant. The "Centurion defendants"—Dr. Samuel Byrd, Dr. Naveen Rajoli, and Centurion Health Services of Indiana—and the "Wexford defendants"—Dr. Byrd, Dr. Rajoli, Dr. Michael Mitcheff, and Wexford of Indiana—have filed two separate motions for summary judgment. For the reasons below, the motions, dkt. [99] and dkt. [122], are **GRANTED**, and final judgment shall now issue.

**I.      Preliminary Matters**

Mr. Kelly's motion to strike the Wexford defendants' reply, dkt. [148], is **DENIED**. Mr. Kelly's motion to file an oversized response brief was granted on October 23, 2023, and the clerk docketed the response that same day. Dkt. 144; dkt. 145. The Wexford defendants filed a timely reply 14 days later, on November 7, 2023. *See* S.D. Ind. L.R. 56-1(c).

Mr. Kelly's motions for leave to file surreplies, dkt. [143] and dkt. [151], are **GRANTED**.

1

## II.     Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba*, 884 F.3d at 717. It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e). The Court

need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572-73 (7th Cir. 2017).

### III.     Factual Background

Because the defendants have moved for summary judgment, the Court views and recites the evidence in the light most favorable to Mr. Kelly and draws all reasonable inferences in his favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

Mr. Kelly reported symptoms of gynecomastia at his IDOC intake in 1997. Dkt. 102-1. He requested surgery in June 1998, but a non-defendant provider informed him that the IDOC does not offer cosmetic surgery. Dkt. 120-2 at 1. The record does not include evidence of any further complaints by Mr. Kelly about gynecomastia until 2010.

In October 2010, another non-defendant provider observed swelling in Mr. Kelly's right breast and a milky discharge from his nipple. Dkt. 102-2. In August 2011, a CT scan of Mr. Kelly's chest indicated mild bilateral gynecomastia. Dkt. 102-3. Another CT scan in January 2012 showed the same.[1] Dkt. 102-4.

In spring and summer 2013, Mr. Kelly again complained of swelling and pain in his left breast. dkt. 102-5; dkt. 102-6; dkt. 102-7. A non-defendant doctor ordered a mammogram, which revealed "[m]oderately severe" but non-cancerous gynecomastia. Dkt. 102-7. Another chest CT scan in October 2014 showed no changes. Dkt. 102-8.

---

[1] Sometime between August 2011 and January 2012, Mr. Kelly was formally diagnosed with testicle seminoma, a form of cancer. Dkt. 124-5 at 4; *see* dkt. 84 at 6. Mr. Kelly received treatment for this cancer and is in remission.

3

Mr. Kelly again reported mild tenderness from his gynecomastia in January 2020. Dkt. 102-10. He told Dr. Byrd that he was worried about breast cancer. Dkt. 102-12. Dr. Byrd ordered lab tests and x-rays. Dkt. *Id.*

Mr. Kelly filed a healthcare request form on February 3, 2020, reporting that his gynecomastia was painful. Dkt. 102-14. Dr. Byrd treated him 10 days later and ordered further screening. Dkt. 102-15. Mr. Kelly wanted a biopsy, but Dr. Byrd advised it was unnecessary. *Id.*

Mr. Kelly filed more healthcare requests on February 16 and February 25, 2020. Dkt. 102-16; dkt. 102-17. Dr. Byrd treated him on March 6, 2020. Dkt. 102-18. Based on lab results, Dr. Byrd ruled out hypogonadism, pituitary, thyroid, or adrenal causes of gynecomastia. *Id.* Dr. Byrd advised that Mr. Kelly should not be experiencing new pain from gynecomastia because the condition had been present for over a decade, and he explained that Mr. Kelly might be experiencing a psychological manifestation of pain. *Id.* Dr. Byrd further advised that the condition was cosmetic that Wexford does not cover cosmetic procedures. *Id.* Dr. Byrd recommended self-examination, and he ordered monthly nursing visits and quarterly doctor visits. *Id.* Mr. Kelly asserts that these monthly and quarterly visits were not implemented. Dkt. 120 at 7.

Before the March 6 visit, Mr. Kelly had pre-written a grievance against Dr. Byrd, and he submitted it after the visit. *Id.* Dr. Byrd responded to an inquiry about the grievance on March 17, 2020:

> The natural course of gynecomastia is that breast tenderness resolves and fibrotic tissue replaces glandular tissue after 12 months. I reviewed this with him using the internet. Pharmacologic therapy is unlikely to be beneficial once fibrous tissue is present, so medication is not indicated. Although breast reduction can be done, it is considered a cosmetic procedure without presence of concerning findings such as breast nodule or other finding suggesting potential cancerous process. . . . He refused breast exam when I saw him last."

Dkt. 120-7.

4

Dr. Rajoli treated Mr. Kelly for gynecomastia on April 14, 2020, and noticed a small node under Mr. Kelly's right areola. Dkt. 102-19 at 2. Dr. Rajoli requested an ultrasound, but Dr. Mitcheff reviewed the medical records and denied the request. *Id.*; dkt. 124-2 at 4, ¶ 13. Dr. Mitcheff noted that Mr. Kelly had experienced gynecomastia for several years prior, and he believed based on experience that temporary, localized swelling related to longstanding gynecomastia was not necessarily cause for concern. Dkt. 124-3 at 2, ¶ 9. Based on Dr. Mitcheff's recommendation, Dr. Rajoli ordered three months of continued monitoring before any ultrasound. *Id.* at 3, ¶ 10; dkt. 124-2 at 4, ¶ 14.

Dr. Rajoli met with Mr. Kelly again on May 5, 2020, and found no changes in symptoms. Dkt. 124-5 at 10. Dr. Rajoli ordered Tylenol 325 mg for Mr. Kelly's breast pain.[2] *Id.* at 11. Dr. Rajoli saw Mr. Kelly for a follow-up appointment on May 13, 2020, and did not order any new treatment. *Id.* at 7.

After Mr. Kelly submitted a healthcare request form, Dr. Rajoli treated him again on June 5, 2020. Dkt. 102-23; dkt. 102-24. Because Mr. Kelly reported that Tylenol was not helping, Dr. Rajoli prescribed Tamoxifen, which is a selective estrogen receptor modulator. Dkt. 102-24; dkt. 124-2 at 5, ¶ 16.

Dr. Byrd treated Mr. Kelly on September 23, 2020. Dkt. 102-25. Mr. Kelly reported that Tamoxifen was ineffective and again requested surgery. *Id.* at 1. Mr. Kelly also reported shortness of breath. *Id.* Dr. Byrd was "not at all convinced gynecomastia [was] the etiology of [Mr. Kelly's] chest pain," because pain does not usually develop from gynecomastia years after the condition first manifests. *Id.* at 1, 3. Dr. Byrd ordered chest x-rays and a 30-day prescription of Mobic for pain. *Id.* at 3. The x-rays did not show any abnormality. Dkt. 102-26.

---

[2] Dr. Rajoli's notes sometimes refer to "mastalgia," which he defines as "a subjective complaint of painful breast tissue." Dkt. 102-28 at 1, ¶ 8.

Mr. Kelly complained of pain in his chest again in February 2021. Dr. Rajoli treated him on February 25 and found "increased fibrosis to the right breast tissue but no masses." Dkt. 120-2 at 11. Dr. Rajoli ordered a care plan for Mr. Kelly's breast pain. *Id.* at 12.

Mr. Kelly saw a nurse on May 26, 2021, for increased breast pain and complaints that Tylenol was not working. Dkt. 102-27.

On July 1, 2021, Centurion took over for Wexford as the medical provider to persons incarcerated at Wabash Valley Correctional Facility. Dkt. 102-28.

Dr. Rajoli treated Mr. Kelly in response to a healthcare request on July 14, 2021. Dkt. 102-30. Mr. Kelly "insist[ed] on getting a surgical referral for mastectomy," but Dr. Rajoli concluded "there is no clinical indication for surgical referral." *Id.* at 1. Dr. Rajoli prescribed extra strength Tylenol and weight loss. *Id.* at 3; dkt. 102-28 at 2, ¶ 12.

Dr. Rajoli treated Mr. Kelly again on August 3, 2021. Mr. Kelly complained that Tylenol, even supplemented with over-the-counter ibuprofen, was not helping his pain. Dkt. 102-33. Dr. Rajoli noted that Mr. Kelly had not been complying with Dr. Rajoli's instructions to avoid tight-fitting clothes and direct contact with the breast tissue. *Id.* For example, Mr. Kelly was sleeping on his chest and wiping sweat from his chest with a paper towel during exercise. Dkt. 102-28 at 2, ¶ 17. Dr. Rajoli continued to not recommend surgery, "due to absence of clinical evidence that supports complete remission of mastalgia and the associated risk factors with surgery." Dkt. 102-33. This was Mr. Kelly's last visit with Dr. Rajoli, who stopped providing medical services at Wabash Valley in December 2021. Dkt. 102-28 at 1, ¶ 2; dkt. 120 at 11.

Mr. Kelly reported in January and February 2022 that Tylenol was not working to treat his breast pain. Dkt. 102-36; dkt. 102-37; dkt. 102-38. Dr. Byrd directed the nursing department to see Mr. Kelly monthly to ensure no changes in his condition. Dkt. 102-38.

Dr. Byrd treated Mr. Kelly on March 2, 2022, for reports of burning pain whenever Mr. Kelly's shirt rubbed against his skin. Dkt. 102-39 at 1. Dr. Byrd noted that these reports contradicted Mr. Kelly's observed behavior, including an instance where he observed Mr. Kelly running in the rain with his shirt on in no apparent discomfort.[3] *Id.* Dr. Byrd ordered a breast ultrasound and added Mobic for pain. *Id.* Dr. Byrd also noted that he would work to get a sports bra for Mr. Kelly, as Mr. Kelly had requested. *Id.* at 1, 3. Mr. Kelly received an ultrasound on March 3, 2022, and the reviewing radiologist found no abnormalities but recommended a mammogram. Dkt. 102-40; dkt. 102-45. Dr. Byrd treated Mr. Kelly on March 23, 2022, and ordered a mammogram based on the radiologist's recommendation. Dkt. 102-45.

A mammogram was completed on June 9, 2022. Dkt. 102-47. The reviewing radiologist found no abnormalities other than gynecomastia. *Id.* Dr. Byrd reviewed the results with Mr. Kelly on June 15, 2022. Dkt. 102-48. Dr. Byrd also sent an email requesting a sports bra because it had not yet been provided despite Dr. Byrd's prior order. *Id.*

Mr. Kelly wrote healthcare requests in July and August 2022 reporting pain and embarrassment from his gynecomastia. Dkt. 102-49; dkt. 102-50. He was treated by a nurse in October 2022 and reported that Tylenol and Mobic were ineffective to treat the pain. Dkt. 102-52.

Dr. Byrd treated Mr. Kelly on October 19, 2022. Dkt. 102-53. Mr. Kelly again reported that Tylenol and Mobic were ineffective to treat his pain. *Id.* Mr. Kelly also reported that he was not using a sports bra because he had read somewhere that it could worsen his symptoms. *Id.* At his July 2022 deposition, Mr. Kelly testified that he was supposed to receive a supportive vest, but he

---

[3] Mr. Kelly explains that he was running because he was in a hurry to request a bathroom pass. Dkt. 120 at 12 n.8. He asserts that Dr. Byrd's reliance on this observation in discounting Mr. Kelly's reports of pain is "laughable and morally reprehensible." *Id.* Mr. Kelly does not explain his apparent lack of breast pain while running with his shirt on in the rain, though he does report that he was wearing loose clothing. *Id.*

also had read online that it would damage his breasts. Dkt. 124-4 at 37−38, Kelly Dep. 144:19−146:14.

Mr. Kelly filed a healthcare request form on November 30, 2022, reporting that Tylenol did not help his pain. Dkt. 102-55. He received a response on December 8, 2022: "Per MD: You should wear sports bra for compression and relief measures. Mobic ordered for pain." *Id.* Mr. Kelly received the same information at a nurse's visit on December 5, 2022. Dkt. 102-56.

Dr. Rajoli believed that Mr. Kelly was experiencing "[a]t most . . . transient discomfort" from his gynecomastia during the relevant timeframe. Dkt. 120-28 at 2, ¶ 19. Similarly, Dr. Byrd does not believe that Mr. Kelly was suffering from severe pain due to gynecomastia. Dkt. 102-57 at 2, ¶¶ 19−20. Mr. Kelly did not present any objective indicators of pain—including elevated blood pressure, elevated heart rate, or grimacing—in Dr. Byrd's presence. *Id.*, ¶ 11. And from Dr. Byrd's perspective, "Mr. Kelly did not consistently complain of pain until years after being first diagnosed with gynecomastia and finding out that another inmate had received a breast reduction at the Wabash Valley Correctional Facility." Dkt. 124-1 at 5, ¶ 15.

### IV.   Discussion

Mr. Kelly contends that Dr. Mitcheff, Dr. Rajoli, and Dr. Byrd were each deliberately indifferent to his serious medical condition. He further contends that Wexford and Centurion were liable for deliberate indifference under the liability theory set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Court first sets forth the applicable Eighth Amendment standards before addressing the individuals' and entities' arguments for summary judgment, in turn.

#### A.   Eighth Amendment Standards

"Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th

8

716, 721–22 (7th Cir. 2021). To prevail on a deliberate indifference claim, "a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (cleaned up).

"A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). But "a doctor's sincere belief that an inmate was malingering does not support an inference of deliberate indifference to the prisoner's medical needs." *Johnson v. Obaisi*, No. 22-1620, 2023 WL 5950125, at *2 (7th Cir. Sept. 13, 2023) (affirming grant of summary judgment in favor of medical provider who treated plaintiff's pain, despite provider's allegations of malingering); *see Townsend v. Cooper*, 759 F.3d 678, 690 (7th Cir. 2014) ("Nor does [Defendant's] remark that [Plaintiff] was faking his symptoms in order to be released from the [behavioral action plan] support a conclusion that she was deliberately indifferent.").

This Court does not understand the Seventh Circuit's holdings in *Johnson* and *Townsend* to insulate medical providers from liability any time they sincerely believe a patient is malingering. Ultimately, the test is whether a provider "actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. In some circumstances, the risk of harm may be so serious that reasonable medical judgment will compel some level of testing or treatment, even if the provider sincerely believes—but is not certain—that a patient is malingering.

### B.     Dr. Rajoli, Dr. Byrd, and Dr. Mitcheff

A reasonable jury, if it credited Mr. Kelly's reports of pain, could find that his gynecomastia constituted a serious medical condition. *See Arnett*, 658 F.3d at 753. To succeed on summary judgment, then, the individual defendants must show that they were not deliberately indifferent to

9

Mr. Kelly's condition—that is, they did not consciously disregard a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Based on the summary judgment record, no reasonable jury would find that any of the individual defendants exhibited deliberate indifference. *See Skiba*, 884 F.3d at 717.

Mr. Kelly contends that the individual defendants' responses to his gynecomastia and complaints of pain were "so plainly inappropriate as to permit the inference that they intentionally or recklessly disregarded those complaints." Dkt. 120 at 26 (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). But the record evidence demonstrates otherwise.

### Dr. Byrd

As Mr. Kelly points out, Dr. Byrd was unconvinced that gynecomastia was causing him significant pain, given the long-term presence of gynecomastia and the relatively recent documented reports of pain. Dkt. 120 at 22. But Dr. Byrd exercised his medical judgment in discounting Mr. Kelly's new complaints of pain. Dkt. 124-1 at 4−5, ¶ 12 (basing his conclusion on "visual observations of Mr. Kelly, as well as [ ] conversations with him and a review of the medical records"). And disbelieving a patient's report of pain, without more, does not constitute deliberate indifference. *Johnson*, No. 22-1620, 2023 WL 5950125, at *2; *Townsend*, 759 F.3d at 690.

Despite Dr. Byrd's skepticism about the reported pain, he did not ignore Mr. Kelly's condition. He ordered lab tests and x-rays in January 2020. Dkt. 102-12. He ordered further screening in February 2020. Dkt. 102-15. In September 2020, he ordered x-rays and prescribed Mobic for pain, believing that Mr. Kelly's pain might be musculoskeletal in nature. Dkt. 102-25. When Dr. Byrd treated Mr. Kelly again in early 2022, he ordered a breast ultrasound and again prescribed Mobic for pain. Dkt. 102-39. He also ordered a sports bra or similar garment. *Id.* But

Mr. Kelly refused to wear it because he had read online that it would damage his breasts. Dkt. 102-53; *see* dkt. 124-4 at 37−38, Kelly Dep. 144:19−146:14.

In short, Dr. Byrd did not "doggedly persist[] in a course of treatment known to be ineffective." *Greeno*, 414 F.3d at 655. He exercised his medical judgment to ensure that Mr. Kelly received proper diagnosis and treatment, even though it was not the treatment—surgery—that Mr. Kelly believed was necessary. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) ("[A]n inmate is not entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." (cleaned up)).

Mr. Kelly's reliance on website printouts does not compel a different result. He cites a printout from www.uptodate.com, which states, "In men with persistent gynecomastia (>1 to 2 years) that the patient finds troubling psychologically, we suggest surgery because the breast tissue has probably become fibrotic and unresponsive to drug therapy." Dkt. 120-3 at 10; *see also id.* at 6 ("Surgical therapy should be considered in men whose gynecomastia does not regress spontaneously, is causing considerable discomfort or psychological distress, or is longstanding (greater than 12 months) **and** the fibrotic stage has been reached." (emphasis retained)). Even if the Court were to treat this document as an expert medical opinion—which it is not—the document at most creates a difference of opinion regarding recommended treatment, which is not enough to show deliberate indifference. *Petties*, 836 F.3d at 729 ("[E]vidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.").

For all these reasons, Dr. Byrd is entitled to summary judgment.

### Dr. Rajoli

Like Dr. Byrd, Dr. Rajoli was skeptical regarding Mr. Kelly's reported pain from longstanding gynecomastia. Also like Dr. Byrd, Dr. Rajoli nevertheless took action to diagnose and treat Mr. Kelly's condition.

Dr. Rajoli requested an ultrasound in April 2020, but that recommendation was rejected by Dr. Mitcheff. Dkt. 109-19 at 2; dkt. 124-2 at 4, ¶ 13. Dr. Rajoli then ordered Tylenol in May 2020, and when Mr. Kelly reported that the Tylenol was ineffective, he prescribed a selective estrogen receptor modulator. Dkt. 124-5 at 11; dkt. 102-24; dkt. 124-2 at 5, ¶ 16. In July 2021, Dr. Rajoli prescribed extra strength Tylenol and recommended behavioral changes, which Mr. Kelly did not consistently implement. Dkt. 102-28 at 2, ¶¶ 12, 17; dkt. 102-30 at 3; dkt. 102-33.

No reasonable jury could find that Dr. Rajoli failed to exercise medical judgment in treating Mr. Kelly's condition. Dr. Rajoli is therefore entitled to summary judgment.

### Dr. Mitcheff

Dr. Mitcheff's only direct connection to Mr. Kelly's gynecomastia treatment was in April 2020, when he denied Dr. Rajoli's request for an ultrasound and recommended three months of monitoring first. Dkt. 124-3 at 2, ¶¶ 8−10; *see* dkt. 102-19 at 2; dkt. 124-2 at 4, ¶¶ 13−14. This recommendation was based on Dr. Mitcheff's medical judgment and experience. Dkt. 124-3 at 2, ¶ 9. Mr. Kelly has not presented any evidence from which a jury could find that Dr. Mitcheff's denial of the ultrasound in April 2020 constituted deliberate indifference. Dr. Mitcheff is therefore entitled to summary judgment.

C.  **Wexford and Centurion**

To prevail on a 42 U.S.C. § 1983 claim against a private entity acting under color of state law—as Wexford and Centurion were here—"a plaintiff must ultimately prove three elements:

12

(1) an action pursuant to a municipal policy, practice, or widespread custom; (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations; and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020).

Here, for the reasons discussed above, Mr. Kelly has failed to demonstrate a triable issue of fact as to any alleged constitutional violation, so he cannot succeed on a claim against Wexford or Centurion. *See Gaetjens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021) (an entity "cannot be liable under *Monell* when there is no underlying constitutional violation"). Mr. Kelly has received a number of diagnostic tests, pain medication, behavioral recommendations (which he failed to consistently implement), and a sports bra (which he refused to wear). He insists that surgery is the only medically acceptable solution, but he has not presented evidence from which a jury could reach that conclusion. Wexford and Centurion are therefore entitled to summary judgment.

## V.     Conclusion

Mr. Kelly's motion to strike the Wexford defendants' reply, dkt. [148], is **DENIED**. His motions for leave to file surreplies, dkt. [143] and dkt. [151], are **GRANTED**.

The defendants' motions for summary judgment, dkt. [99] and dkt. [122], are **GRANTED**.

Final judgment in accordance with this Order, as well as the Court's screening order dated August 20, 2021, dkt. [8], shall now issue.

**IT IS SO ORDERED.**

Date: 1/3/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

13

Distribution:

MCKINLEY KELLY
973030
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

David Douglas Becsey
ZEIGLER COHEN & KOCH
dbecsey@zcklaw.com

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Roger K. Kanne
ZEIGLER COHEN & KOCH
rkanne@zcklaw.com

Bradley L. Wilson
Wilson Melton, LLC
bwilson@wilsonmelton.com